**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| The Phoenix Insurance Co., Limited as subrogator underwriter of Enerco Enterprises Limited,<br><br>      Plaintiff,<br><br>v.<br><br>Norfolk Southern Railroad Corp. and Kavanagh Logistics Inc.<br><br>      Defendants. | Civ. No.  11-00398 (KM)<br><br>**O P I N I O N** |

*Appearances by:*

Kevin J. Bruno
BLANK ROME LLP
301 Carnegie Center
Princeton, NJ 08540

   *Attorney for Plaintiff*

Jeffrey D. Cohen
Christopher J. Merrick
KEENAN COHEN & HOWARD P.C.
One Pitcairn Place
165 Township Line Road, Suite 2400
Jenkintown, PA 19046

   *Attorneys for Defendant Norfolk Southern Railway Company*

Alan C. Milstein
Michael Dube
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057

   *Attorneys for Defendant Kavanagh Logistics, Inc.*

**DEBEVOISE, Senior District Judge**

This case arises out of a claim raised by an insurance company as the subrogated underwriter of its insured.  Plaintiff Phoenix Insurance Co. Limited ("Phoenix") argues that its insured, Enerco Enterprises Limited ("Enerco"), was not notified of its right to full insurance liability pursuant to the Carmack Amendment, 49 USC 11706, thus entitling it to damages on various grounds.  Phoenix brings a cause of action against Defendant Norfolk Southern Railway Company ("Norfolk Southern") for breach of contract, negligence, and disregard of duties and obligations under the Carmack Amendment for damage which occurred to Enerco's electrical transformer (the "Transformer") while en route from New Jersey to Canada.  Phoenix brings a second cause of action against Defendant Kavanagh Logistics ("Kavanagh") for breach of contract, negligence, and breach of its obligation as an agent of Enerco, for its role in arranging the shipment of the Transformer.

The Court is presented with Phoenix's motion for partial summary judgment on limitation of liability; Norfolk Southern's motion for partial summary judgment on limited liability and preemption of the state law claims against it for breach of contract and negligence; and Kavanagh's motion for summary judgment on all claims brought against it: breach of contract, negligence, and breach of its obligation as an agent of Enerco.  For the reasons set forth below, Phoenix's motion is denied, Norfolk Southern's motion is granted in full, and Kavanagh's motion is granted in part to the extent that the subrogation action may proceed up to the limitation of liability.  There remain the Carmack Amendment claim against Phoenix subject to the limitation of liability, and the state law claims against Kavanagh, also subject to the limitation of liability.

## I.     BACKGROUND

### A.  Factual History

Plaintiff Phoenix brings this suit as the subrogated insurance underwriter of Enerco, an Israeli business which sells large electrical transformers.  Phoenix and Enerco maintained a floating policy agreement which provides all-risk coverage by which Phoenix is notified prior to each shipment, and by which Phoenix is notified on a monthly basis of shipments already shipped.  Phoenix covers loss or damage to the shipment based on the contractual obligation of the delivery at issue.  It is undisputed that Phoenix charged Enerco no more than $15,000 to cover shipment of the Transformer at issue which was worth approximately $2,000.000, for its shipment from the country of manufacture, Israel, to its destination in Canada, regardless of the method of transportation used.

On or about June 5, 2007, Mr. Gideon Muscatel of Enerco contacted Mr. Larry Pharr of Kavanagh, a transportation logistics company, for a price quote for the rail transportation of the Transformer from Port Elizabeth, New Jersey to Ontario, Canada.  Specifically, the request covered delivery of the containers by rail from the port to Canada, and back.  (Pl.'s Ex. G.) When Mr. Muscatel arranged for the transportation of the Transformer, he was aware that Phoenix covered Enerco for any risk of loss. This was not the first goods arrangement between Enerco and Kavanagh.  Indeed, the Transformer was the seventh or eighth manufactured by Enerco for which Kavanagh arranged transport.

All communications with Kavanagh regarding the details of the transportation arrangements of the Transporter were conducted between Mr. Pharr and Mr. Muscatel.  Mr. Pharr began working for Kavanagh in 2002 after working in the trucking industry since 1970. Mr. Pharr had been employed by Kavanagh for five years before the transportation of the transformer was arranged.  At the time transportation for the transformer was arranged, Mr. Pharr had dealt with Norfolk Southern for over five years.

3

It is undisputed that Kavanagh performed more services on behalf of Enerco than simply ordering rail transportation.  Kavanagh also coordinated the rail carrier to ensure that the rail car was available at the port of arrival, arranged for the lashing of the transformer to the rail car, and coordinated offload of the Transformer with its final purchaser and destination.

On or about June 18, 2007, Mr. Pharr requested a quote from Norfolk Southern to perform the relevant rail carriage.  On June 27, 2007, Norfolk Southern sent an email to Mr. Phar offering a freight rate of $44,123, offer open until December 31, 2007.  Norfolk Southern's email also stated:  "Rate offered at maximum carrier's liability of $25,000 per shipment.  *Greater liability coverage is available, rates subject to change accordingly*." (emphasis added).  Kavanagh did not forward this email detailing Norfolk Southern's price quote and availability of greater liability coverage to Enerco.

Norfolk Southern subsequently sent Kavanagh a Rail Authority NSSQ 44504 Transmittal (the "Rate Transmittal") which reiterates the freight rate, and notes "limited railroad liability to a maximum of $25,000 per car for loss or damage to commodity."  The Rate Transmittal additionally provides that the pricing is "subject to the rules and provisions published in Norfolk Southern Railway Conditions of Carriage – Series or successor publication."[1]  Kavanagh did not

---

[1]     Rule 290 of the Conditions of Carriage sets forth carrier liability for loss and damage, and provides in relevant part:

> Unless modified in a transportation contract or a general or customer specific rate quotation, NS will assume liability for loss and damage under the terms of 49 USC 11706 and the terms of the Uniform Bill of Lading as specified in Rule 150 herein.  Where provisions maintained by other railroad parties to the through route differ from those provided herein, the level of liability assumed by the origin carrier will apply; provided, however, that such level of liability shall not exceed the level of liability assumed under the Carmack Amendment.

(Pl.'s Ex. M.)

forward the Rate Transmittal to Enerco, although the Conditions of Carriage referenced therein is available to the public on the Internet.  The record does not support a factual finding that Enerco had notice of the existence of the Norfolk Southern's Conditions of Carriage, although Kavanagh clearly did.

On June 27, 2007, Kavanagh emailed Enerco its own quote of $66,960 which included the cost of rail transportation, the cost of specialized railcars, the cost of the securement of the Transformer to the railcar, and Kavanagh's markup.  Of import here, Kavanagh provided no notice of the availability of a rate for full liability, an alternative freight rate, the statement contained in Norfolk Southern's June 27 email concerning the availability of greater liability coverage, or the Rate Transmittal itself which internally referenced the Conditions of Carriage which itself limitedly references levels of liability.  Rather, Kavanagh informed Enerco that the rail shipment and container shipment was subject to "$25,000 limited liability per car."

Norfolk Southern has an internal value policy which estimates full Carmack liability coverage at twenty-five percent of the total value of the item.  Here, the Transformer was valued at two-million dollars, and thus the rail-carrier would have provided full Carmack coverage for $500,000. (Achimasi Dep., 123:19-124:5; 125:6-22.)[2]

According to Mr. Muscatel, based on his dealings, transportation logistics companies always provide a $25,000 limited liability cap with regard to use of different rail companies, and

---

[2]     Phoenix disputes that it would have cost Enerco $500,000 to obtain full Carmack coverage from Norfolk Southern.  However, the rail-carrier's 30(b)(6) witness, Ms. Achimasi, testified that this was a matter of internal policy.  Specifically, Phoenix argues that the charge for full liability could be negotiated and changed.  However this statement is not supported by the factual record on which Phoenix relies.  Ms. Achimasi expressly testified that she would be speculating as to the possibility of full coverage for less than 25 percent without written authorization from the rail-carrier's law department to do so. Further, Ms. Achimasi expressed doubt that a lower rate would be approved by the law department. (Singleton Aff. Ex. D, Achimasi Dep., 129:2 – 132:3.)

"there is no other option" and the cap is "not something that you can even negotiate." (Muscatel Dep. 69:2 – 70:9; 72:4-6.)  Indeed, Mr. Muscatel was under the impression that "[t]his is a policy dictated by the rail company.  It says its [sic] 25 limited liability, take it or leave it.  So I have to take it." (Id.)  Moreover, Mr. Muscatel testified:

> [T]his issue of being able to bypass the limitation of liability only came up later, much later, pursuant to this lawsuit and investigation afterwards by The Phoenix that this question even came up and the ability to actually do it came up.  Before that, that wasn't an issue at all.  It was not even an option.

(Id. at 74:1-8.)  Importantly, Mr. Muscatel testified that it is "impossible" to know whether Enerco would have actually purchased full Carmack coverage had it known of its availability. (Muscatel Dep. at 103:10-106:10.)

Mr. Pharr testified that he did not provide information regarding the option of greater liability to Enerco because he knew that Enerco was already insured with Phoenix.  Further, Mr. Muscatel instructed Mr. Pharr to obtain the lowest freight rates possible for the rail transportation of the Transformer. Mr. Pharr had previously arranged for the transportation of Enerco's freight many times prior to this shipment, and Mr. Muscatel had always requested the lowest rate available.  Indeed, Mr. Pharr testified that he understood that the rail-carrier could offer Enerco higher liability insurance at a greater rate (Pharr Dep. 38:9 – 39:5, 45:5-11), although the record is not clear as to Mr. Pharr's knowledge of the availability of full Carmack Coverage. Specifically, his deposition testimony sets forth:

> Q.  But you don't know on the railroad side if they could obtain full coverage, do you?
> A. No.
> Q.  Do you know whether the customer could make a declared value and fully, as you've used the word, insure with the railroad that declared value?
> A. My understanding is yes.

(Pharr Dep. 45:20 – 46:1.)

It is undisputed that no Kavanagh customer has ever chosen to purchase full Carmack coverage.  Indeed, Mr. Kavanagh testified that Enerco never did so during the entirety of Mr. Kavanagh's thirty years of experience in the business.  Consistently, Ms. Achimasi had no recollection of a Norfolk Southern customer accepting any Carmack liability rates. (Milstein Cert., Ex. F.)

Relatedly, Norfolk Southern never advised Enerco directly of any alternative freight rate or any rate based on full liability. Kavanagh never received any instructions from Norfolk Southern about providing alternative or full freight rates to the shipper. Indeed, Norfolk Southern did not have a policy of requiring logistics providers to give rates that reflect full liability.

The shipment of the Transformer was delayed and on October 17, 2007, Enerco advised Mr. Pharr that the Transformer would be shipped from Israel in November and requested that Kavanagh order a railcar for its arrival at Port Elizabeth.  After some discussion about a change in destination in Canada, Mr. Pharr ultimately confirmed that Norfolk Southern was prepared to carry the Transformer for the same price and that "the same conditions as originally provided will apply."

Enerco shipped the Transformer on November 27, 2007.  It arrived in Port Elizabeth and was loaded on a Norfolk Southern railcar on or about December 14, 2007.

The Bill of Lading was prepared by Kavanagh and identifies Norfolk Southern as the initiating rail-carrier until Buffalo, New York, and Canadian National for the remaining transportation to rail destination.  Therein, Enerco is listed as the shipper, and Kavanagh Logistics and Mr. Pharr are listed as the notifying party.  Based on this information, Norfolk Southern issued a Waybill.  Notably, neither the Bill of Lading nor the Waybill expressly state

the availability of full Carmack coverage.  However, the Bill of Lading identifies the Rate

Transmittal as applying, which in turn identifies the rail-carrier's Conditions of Carriage as

applying.  As noted above, the Conditions of Carriage vaguely reference the availability of

different rates pursuant to full Carmack liability. See footnote 1, supra, and accompanying text.

The Transformer was ultimately damaged en route and returned to Israel where it was

repaired and reshipped to the receiver in Canada, at Phoenix's expense.  Enerco's claim as a

result of the damage to the Transformer apparently totals $911,233, exclusive of interest and

costs, although the Court has not been directed to the facts in the summary judgment record to

support this figure.  Phoenix paid Enerco $750,000 pursuant to a settlement.  (Singleton Aff. Ex.

A, Muscatel Dep. at 146:11-20.)

Originally, according to Phoenix, "Phoenix paid Enerco *in full* for the loss." (Compl. ¶

20, emphasis added.)  Despite having alleged in the Complaint that Enerco was paid "in full" for

its loss, Phoenix now disputes that the settlement "did not fully cover all losses suffered by

Enerco." (Phoenix counterstatement to Def. Kavanagh's SUMF, ¶ 18.)  In support of this

contention, Phoenix references the deposition testimony of Mr. Muscatel, which provides:

> Q.  With respect to the amount of dollars that were paid by
> Phoenix, there was $750,000 paid from Phoenix to Enerco,
> correct?
> A.  Correct.
> Q.  But the total damages of Enerco were $850,000, is that right?
> A.  As I say, I don't have the exact numbers.  I'm saying
> approximately or to that effect.  Could be 850.  Could be 900.  I
> don't have the exact numbers.
> Q.  The transformer was not a total loss.  It was repaired.
> A.  Correct.
> Q.  That's why the damages were not 1.9 million.  Instead they
> were a smaller –
> A.  Correct.
> Q.  Was this transformer that was fixed, was that re-sent back to
> Canada?
> A.  Yes.

> Q.  And is it in operation now?
> A.  Yes.
> Q.  So the complaint provides in paragraph 20 – that's Exhibit 9 –
> the shipment – on page four.  The shipment of Enerco's
> transformer was insured by Phoenix and Phoenix paid Enerco in
> full for the loss.  That's not correct. Enerco was not paid in full for
> the loss, correct?
> A.  *Well, once we settled, we signed a document saying we don't
> have any other claims so that's why –*
> Q.  *They were paid pursuant to a settlement but not for full
> damages, correct?*
> A.  *Well, yes, that's correct.  But we're not claiming any other
> thing from them.*

(Muscatel Dep. at 146: 11 – 147:20, emphasis added.)[3]

Despite the previous mishap, Enerco selected Kavanagh to arrange for the transport of the Transformer's second shipment, and again selected Norfolk Southern to conduct it.  Again, Enerco maintained limited liability coverage for the second shipment.  Since, Enerco has shipped numerous additional transformers using Kavanagh's services (and continues to do so), in addition to using services of other entities.  Importantly, certainly since the initiation of this suit, Enerco has been fully aware of the availability of full Carmack coverage, but has never chosen to purchase full coverage.

### B.  Procedural History

On January 21, 2011, Phoenix filed suit, as subrogated underwriter of Enerco, against Norfolk Southern and Kavanagh (collectively "Defendants").  First, Phoenix raises breach of contract and/or negligence claims against Defendants.  Second, Phoenix brings a claim against Norfolk Southern for violation of the Carmack Amendment, and against Kavanagh for breach of its obligation as an agent due to the Carmack Amendment.

---

[3]     Phoenix additionally relies on Mr. Muscatel's Deposition pages 320:3-32:13 in support of its contention that Enerco was not paid in full for its loss when it settled with Phoenix.  However, those pages are not included in any of the moving briefs for summary judgment, and therefore the Court relies on Mr. Muscatel's deposition testimony as set forth above.

The Court is currently presented with three motions filed by the parties.  Phoenix filed a motion for partial summary judgment on limitation of liability.  Phoenix seeks to limit Defendants' affirmative defense to limit liability to $25,000.  Phoenix argues that because federal law requires rail carriers to give shippers an alternative freight rate based on full liability, and the undisputed facts prove that no such alternative rate was given to Enerco, the Court should hold that the Defendants are not entitled to limit their liability and that Enerco is entitled to full provable damages.

Norfolk Southern moves the court for partial summary judgment that the subrogated claims be limited to a maximum of $25,000 because the rail-carrier advised Kavanagh that full Carmack coverage was available.  Norfolk submits that an intermediaries' agreement with a carrier binds the shipper to the limited liability terms in those agreements.  Additionally, Norfolk Southern argues that the state claims against it are preempted.

Kavanagh moves for summary judgment against Phoenix on all claims.  Kavanagh emphasizes that the record does not support that Enerco would have opted for full Carmack coverage even if it were made available.  Kavanagh argues that general subrogation principles bar Phoenix's claims against it where no causation or damages are evident.  Kavanagh notes that the existence of the limited liability permitted Enerco to seek business and full insurance from Phoenix to begin with.  Thus, Kavanagh argues that Phoenix is not even entitled to the $25,000 limited liability because it is barred from suing as subrogate.

## II.     ANALYSIS

The Court is presented with three primary inquiries: 1) the issue of the availability of limited liability pursuant to the Carmack Amendment; 2) the issue of subrogation and

10

specifically the extent to which Phoenix may subrogate Enerco's claims here; 3) the extent to which the state law claims against the Defendants are preempted.

## 1. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

> [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999). See also Scott v. Harris, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

## 2. The Carmack Amendment

The Carmack Amendment of 1906 to the Interstate Commerce Act is codified at 49 USC 11706, and provides for the liability of interstate carriers for damage to the goods transported.

Under the Act, a rail carrier providing transportation or service subject to the jurisdiction of the Surface Transportation Board must issue a receipt or bill of lading for property it receives for transportation. 49 USC 11706(a). Along with any other rail carrier that delivers the property, the rail carrier is liable to the "person entitled to recover under the receipt or bill of lading," for the "actual loss or injury to the property caused by" the receiving carrier, the delivering carrier, or another carrier over whose line or route the property is transported. Id.[4]   Thus, Carmack imposes upon "receiving rail carrier[s]" and "delivering rail carrier[s]" strict liability for damage caused during rail transportation under the bill of lading, regardless of which carrier caused the damage.  Id.

The two often cited purposes of the Carmack Amendment are to (1) remove "the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods[,]" Reider v. Thompson, 339 U.S. 113, 119 (1950); and (2) "to protect shippers from carriers who would take advantage of their own superior knowledge and leverage when dealing with unwary shippers," Siren, Inc. v. Estes Express Lines, 249 F.3d 1268, 1271 (11th Cir. 2001).  Carmack is designed to create a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading. See e.g., Usinor Steel Corp. v. Norfolk Southern Corp., 308 F. Supp. 2d 510 (D.N.J. 2004).

Except as otherwise provided by 49 USC 1101 et seq., the jurisdiction of the Surface Transportation Board is exclusive and includes remedies as set forth therein with respect to rates, practices, and services. 49 USCS 10501(a), (b).  The statutory scheme sets forth that the policy of the U.S. Government in regulating the railroad industry includes: "allow[ance], to the

---

[4]     "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18-19 (2004).

maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;" "promot[ion] [of] a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Board;"  and "[maintenance of] reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital[.]" 49 USCS 10101(1), (3), (6).

Of import here, the Carmack Amendment expressly allows the rail carrier and shipper to agree to a limitation of liability.  Specifically, "the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier[.]" 49 USC 11706(c)(3)(a).  Except as provided within subsection (c), a "rail carrier may not limit or be exempt from liability imposed under subsection (a) [49 USC 11706(a).]" 49 USC 11706(c)(1).

The Third Circuit Court of Appeals instructs that "a carrier must continue to offer two or more rates with corresponding levels of liability in order to successfully limit its liability pursuant to the Carmack Amendment." Emerson Elec. Supply Co. v. Estes Express lines Corp., 451 F.3d 179, 187 (2006), relying in part on Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834, 841-42 (11th Cir. 2003) ("[A] carrier wishing to limit its liability is still required to give the shipper a reasonable opportunity to choose between different levels of liability.").

Federal law requires that a carrier may limit its liability only if it takes the following four steps:

> (1)  Provide the shipper, upon request, a copy of its rate schedule;
> (2) give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to his choice of carrier liability limit; and (4) issue a bill of

lading prior to moving the shipment that reflects any such
agreement.

ABB Inc. v. CSX Transportation Inc., 721 F.3d 135, 139 (4th Cir. 2013); See also Carmana

Designs, Ltd. v. North American Van Lines, Inc., 943 F.2d 316, 319 (3d Cir. 1991).

Phoenix argues that Norfolk Southern is responsible for full Carmack liability because
Enerco was unaware of the availability of different rates and corresponding levels of liability.
However, here, Norfolk Southern clearly notified Kavanagh at the first instance of the
availability of greater liability coverage.  Specifically, Norfolk Southern's response to
Kavanagh's price quote request provided:  "Rate offered at maximum carrier's liability of
$25,000 per shipment.  Greater liability coverage is available, rates subject to change
accordingly."  Phoenix contests that Kavanagh's involvement does not insulate the rail-carrier
from liability because "Norfolk Southern never provided Kavanagh with a full liability freight
rate and the undisputed evidence is that Kavanagh did not know what the full liability freight rate
was or that the shipper could obtain full liability from the railroad by paying a greater freight
rate.  So even if Kavanagh's knowledge theoretically could be imputed to the shipper, there was
no knowledge to impute."  (Pl.'s Opp. Br. to N.S.'s MSJ at 6.)

The record establishes that Mr. Pharr understood that greater liability rates were
available; however the record is not clear as to his understanding of the availability of full
Carmack liability.  The Court notes that, despite Norfolk Southern's initial express offering of
the availability of greater liability coverage at a different rate, the Bill of Lading (which was
prepared by Kavanagh) does not clearly set forth as much.  Rather, the Bill of Lading identifies
the Rate Transmittal as applying, which in turn identifies the Norfolk Southern's Conditions of
Carriage which only vaguely reference the availability of different rates pursuant to full Carmack
liability.

Phoenix argues that the Staggers Rail Act, 49 U.S.C. 10502(e), mandates that a rail carrier must provide a full liability rate pursuant to the Carmack Amendment.  Section 10502 applies to freight that has been exempted from regulation by the Surface Transportation Board.  However, Section 10502 does not apply to the transportation of electrical transformers.  Indeed, the Surface Transportation Board has specifically carved out transformers from the exemption issued for electrical machinery.  See 49 C.F.R. 1039.11 at 36.12.  Thus, Section 10502 is not applicable to this case.

The Court is guided by the Third Circuit Court of Appeals' instruction whereby "a carrier must continue to offer two or more rates with corresponding levels of liability in order to successfully limit its liability pursuant to the Carmack Amendment." Emerson v. Estes, 451 F.3d at 187.  See also ABB Inc. v. CSX, supra, 721 F.3d at 139; Carmana v. North American, supra, 943 F.2d at 319.  Norfolk Southern offered as much, and the Court is disinclined to reach the wording which Phoenix argues is mandatory, i.e., that the specific rate for full liability must be provided.  Indeed, the terms of the Carmack Amendment do not require that a rail-carrier offer a full liability rate if it wishes to contractually limit its liability.  Carmack allows for a limitation of liability "to a value established by written declaration of the shipper" or "by a written agreement between the shipper and the carrier[.]"  49 USC 11706(c)(3)(a).  Based on the facts here, Norfolk Southern provided a reasonable opportunity for the choice between different levels of liability.

Furthermore, Agreements reached between carriers and intermediaries are binding with respect to limited liability terms within those agreements.  Norfolk Southern Ry. V. James N. Kirby, Pty Ltd., 543, U.S. 14 (2004), is directly on point and guides the relevant analysis.

> When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed. The intermediary is certainly not automatically empowered to be

15

the cargo owner's agent in every sense.   That would be unsustainable.   But when it comes to liability limitations for negligence resulting in damage, an intermediary can negotiate reliable and enforceable agreements with the carriers it engages.

We derive this rule from our decision about common carriage in *Great Northern R. Co. v. O'Connor, 232 U.S. 508, 58 L. Ed. 703, 34 S. Ct. 380 (1914).*   In *Great Northern*, an owner hired a transfer company to arrange for the shipment of her goods. Without the owner's express authority, the transfer company arranged for rail transport at a tariff rate that limited the railroad's liability to less than the true value of the goods.   The goods were lost en route, and the owner sued the railroad.   The Court held that the railroad must be able to rely on the liability limitation in its tariff agreement with the transfer company.   The railroad "had the right to assume that the Transfer Company could agree upon the terms of the shipment"; it could not be expected to know if the transfer company had any outstanding, conflicting obligation to another party. *Id., at 514, 58 L. Ed. 2d 703, 34 S. Ct. 380.*   The owner's remedy, if necessary, was against the transfer company. *Id., at 515, 58 L. Ed. 2d 703, 34 S. Ct. 380.*

[ . . . ]

We think reliance on agency law is misplaced here.   It is undeniable that the traditional indicia of agency, the fiduciary relationship and effective control by the principal, did not exist between Kirby and ICC. See Restatement (Second) of Agency § 1 (1957).   But that is of no moment.   The principle derived from *Great Northern* does not require treating ICC as Kirby's agent in the classic sense.   It only requires treating ICC as Kirby's agent for a *single, limited* purpose:   When ICC contracts with subsequent carriers for limitation on liability.   In holding that an intermediary binds a cargo owner to the liability limitations it negotiates with downstream carriers, we do not infringe on traditional agency principles.   We merely ensure the reliability of downstream contracts for liability limitations.   In *Great Northern*, because the intermediary had been "entrusted with goods to be shipped by railway, and, nothing to the contrary appearing, the carrier had the right to assume that [the intermediary] could agree upon the terms of the shipment." *232 U.S., at 514, 58 L. Ed. 2d 703, 34 S. Ct. 380.* Likewise, here we hold that intermediaries, entrusted with goods,

are "agents" only in their ability to contract for liability limitations
with carriers downstream.

Id. at 33-34.[5]

Kirby explains that "a limited agency rule tracks industry practices." Id. at 34.  While

Kirby applies its reasoning in the intercontinental ocean shipping context, it is equally applicable

to the general transportation logistics industry and specifically rail-carrier and broker

arrangements.  Kirby inherently recognizes this in constructing the limited agency rule based on

previous Supreme Court precedent in Greater Northern wherein the rule applied in the context of

a contract between a rail-carrier and the intermediary transfer company which arranged for the

shipment.  "The railroad 'had the right to assume that the Transfer Company could agree upon

the terms of the shipment'; it could not be expected to know if the transfer company had any

outstanding, conflicting obligation to another party." Id. at 33-34, supra.

The Court finds that Norfolk Southern met its obligation pursuant to the Carmack

Amendment by providing a reasonable opportunity for the choice between different levels of

liability. That the rail-carrier communicated the liability scheme with a logistics broker does not

expose it to the default of full Carmack liability.  Here, Kavanagh was entrusted to arrange for

the transport of Enerco's goods, and was therefore Enerco's agent only in the ability to contract

for liability limitations with the rail-carrier.  Therefore, Phoenix's motion for partial summary

---

[5]     Additionally, the Supreme Court set forth three policy considerations to support its
holding.  First, Kirby persuasively explains that if the court were to find otherwise, "carriers
would have to seek out more information before contracting, so as to assure themselves that their
contractual liability limitations provide true protection.  That task of information gathering might
be very costly or even impossible, given that goods often change hands many times in the course
of intermodal transportation."  Id.at 34 -35.  Second, Kirby reasoned that "if liability limitations
negotiated with cargo owners were reliable while limitations negotiated with intermediaries were
not, carriers would likely want to charge the latter higher rates." Id. at 35.  Relatedly, such a rule
may conflict with law which promotes nondiscrimination in common carriage. Id.  Third, Kirby
noted the equitable result that the broker therein was the only party that definitely knew about
and was party to both bills of lading at issue should bear responsibility for any gap between the
liability limitations in those bills.  Id.

judgment on limitation of liability is denied and Norfolk Southern's motion for partial summary judgment is granted as to the same.  Phoenix's claims are therefore limited to a maximum of $25,000 pursuant to the terms of the shipping arrangement between Norfolk Southern and Kavanagh, acting as Enerco's intermediary.

Phoenix dedicates two paragraphs in its twenty-three page brief in support of the notion that Kavanagh has no right to limit its liability.  Without citation to any case law or statute, Phoenix avers that because the contract is limited to Norfolk Southern and does not include Kavanagh, Kavanagh is not entitled to the limitation.  However, the motion does not address its claims against Kavanagh for breach of contract, negligence, or breach of its obligation as an agent due to the Carmack Amendment.  Indeed, Phoenix's legal arguments are directed to the entitlement of Norfolk Southern to limit its liability pursuant to the Carmack Amendment.  Therefore, Phoenix's motion to deny Kavanagh entitlement to limited liability is denied.

### 3.  Subrogation

The Court is next presented with whether, and the degree to which, Phoenix may subrogate the claims here.  Kavanagh moves for summary judgment relief as to all claims against it on the basis that they are barred due to general subrogation principles because Enerco has not suffered a loss and has not been damaged.  Relatedly, Kavanagh argues that under well-established unified federal common law regarding subrogation claims such as this one, where a shipper obtains private insurance, a loss occurs during shipment, and the shipper's insurance company pays on that loss, there is no subrogation claim based upon a failure to make the shipper aware of the option of purchasing full coverage from the carrier.  Notably, Phoenix does not offer any case law in its opposition to Kavanagh on the issue of subrogation, but simply distinguishes the cases on which Kavanagh relies.  Phoenix additionally avers that at a minimum, Kavanagh's motion should be denied due to remaining questions of material fact as to whether

18

Enerco consciously opted to forgo full Carmack coverage here, regardless of whether Kavanagh negligently or deliberately failed to give Enerco a choice.

It does not escape the Court that no customer of Kavanagh or Norfolk Southern has ever opted for full Carmack coverage; nor has Enerco ever opted for it, even after clearly being made aware of its availability following the initiation of this suit.  Indeed, in order to opt for it, Enerco would have had to pay Norfolk Southern $500,000, whereas its floating, all-risk coverage with Phoenix was available at no more than $15,000 for the shipment.

Moreover, Enerco's corporate designee testified that it is "impossible" to know whether Enerco would have actually purchased full Carmack coverage, and that "nobody" at Enerco would know whether full Carmack coverage would have been purchased.  His testimony set forth:

> Q.  So you have no idea, you're going to testify under oath, none whatsoever, whether or not Enerco would pay $500,000 or even $250,000 to have this additional liability coverage from Port Elizabeth to Ontario?
>
> [An objection is interposed.]
>
> THE WITNESS:  Correct.
>
> (Muscatel Dep., 343:3-6.)

Phoenix raises three claims against Kavanagh: breach of contract, negligence, and breach of its obligation as an agent due to the Carmack Amendment.  As such, Phoenix bears the initial burden of proof that it is more likely than not that Enerco would have purchased full Carmack coverage. However, there is insufficient evidence to establish the existence of an element essential to its case, thus rendering all other facts immaterial. See Celotex, 447 U.S. at 323, supra.   First, Enerco's corporate designee testified that it was "impossible" to know whether it would have been purchased, and that "nobody" would know the answer to the question.  Second,

19

Enerco has never opted to purchase full Carmack coverage, nor has any customer of Kavanagh

or Norfolk Southern ever opted for it.  Third, the basic business decision to opt for double-

coverage at a total cost of $515,000, which represents over 25% of the value of the item itself, is

not persuasive where Enerco already had a floating, all-risk policy with Phoenix which covered

this shipment at a substantially lower rate of $15,000.  There is simply no factual support on the

record beyond pure speculation that Enerco would have opted for full Carmack coverage had

Kavanagh relayed its availability.  Instead, Phoenix attempts to argue that Enerco may have

attempted to negotiate with Norfolk Southern for a lower rate for full coverage.  However,

Norfolk Southern's corporate designee testified that no such negotiation would have been

available. (See supra, note 2.)

　　　"It is well-established that subrogation is derivative in nature, placing the subrogee 'in the

precise position of the one to whose rights and disabilities he is subrogated.'" Church Mutual

Ins. Co. v. Palmer Construction Co., 153 Fed. Appx. 805, 808 (3rd Cir. 2005) (internal citation

omitted).  It is undisputed that Enerco assigned its rights of action here to Phoenix.  The

Carmack Amendment establishes rail carrier liability to the "person entitled to recover under the

receipt or bill of lading." 49 USC 11706(a).  "The rights of action under the bill of lading may be

properly assigned to another, who is then entitled to maintain the action against the rail carrier as

the real party in interest." Hansa Meyer Transport GMBH & CO., KG v. Norfolk Southern

Railway Co., 2008 U.S. Dist. LEXIS 43915 (D.S.C. 2008) (relying on Harrah v. Minnesota Min.

and Mfg. Co., 908 F. Supp. 313, 318 (D.N.J. 1992)).

　　　The New Jersey Supreme Court provides the basic framework of subrogation:

> Subrogation is a device of equity to compel the ultimate discharge
> of an obligation by the one who in good conscience ought to pay it.
> It is a right of ancient origin, having been imported from the civil
> law to serve the interests of essential justice between the parties.  It

is most often brought into play when an insurer who has indemnified an insured for damage or loss is subrogated to any rights that the insured may have against a third party, who is also liable for the damage or loss.  In such a case it is only equitable and just that the insurer should be reimbursed for his payment to the insured, because otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the third party, or in the absence of such double recovery by the insured the third party would go free despite the fact that he has the legal obligation in connection with the loss or damage.

Subrogation is highly favored in the law, although it is not an absolute right but rather applied under equitable standards with due regard to the legal and equitable rights of others:

> The right of subrogation must be founded upon an equity just and reasonable according to general principles – an equity that will accomplish complete justice between the parties to the controversy.  The one asserting the right cannot thereby profit from his own wrong; he must, himself, be without fault. . . . The process is analogous to the creation of a constructive trust, the creditor being compelled to hold his rights against the principal debtor, and his securities, in trust for the subrogee.

Standard Accident Ins. Co v. Pellecchia et al., 15 N.J. 162, 171-72 (1954) (internal citation omitted).

Thus, Pelluchia instructs that an insurer should be reimbursed for payments to the insured because equity would not prevail where a "third party would go free despite the fact that he has the legal obligation in connection with the loss or damage."  Id.  Simultaneously, the insurer cannot "profit from his own wrong; he must, himself, be without fault."  Id.

Phoenix claims that Enerco apparently suffered $911,233 in damages, exclusive of interests and costs.  The record does not set forth details of this apparent loss.  Phoenix then paid Enerco $750,000 pursuant to a negotiated settlement.  Curiously, however, although Enerco's initial loss was recouped in part by this settlement, Phoenix now apparently seeks to recover the original $911,233 loss.  (See Pl.'s Opp. Br. to Kavanagh MSJ at 6, "Plaintiff's damages as a

result of Kavanagh's acts or omissions therefore are the difference between $25,000 and Plaintiff's full provable losses.").

Kavanagh argues that Phoenix is not even entitled to recover the $25,000 limitation of liability because Enerco was already paid "in full" for its loss when it negotiated and settled its claims with Phoenix. (Compl. ¶ 20.) Kavanagh highlights Phoenix's intimation that Enerco was underpaid pursuant to the $750,000 settlement. Indeed, this logic entails that because Phoenix underpaid Enerco in the first place, Phoenix would now be able to stand in Enerco's shoes to recoup that underpayment. Kavanagh contends, "[i]f this were true, Phoenix will have profited in the amount of $300,000 by breaching the Policy: it would get to retain the $150,000 that it wrongfully failed to pay to Enerco, and receive a $150,000 windfall from the Defendants to boot. This is nonsensical and contrary to the most basic principles of subrogation." (Kavanagh Reply Br. at 5.)

The Court is not persuaded that Enerco was wronged by Phoenix's failure to compensate it in full for its total damages. Enerco has brought no such claim here, and Mr. Muscatel indicated that pursuant to their settlement, Enerco is not "claiming any other thing from [Phoenix]." (Muscatel Dep., supra, at 146: 11 – 147:20.) As discussed at length above, Norfolk Southern and Kavanagh, as a limited agent for the purpose of contracting on behalf of Enerco, entered into a contract for rail shipment of goods. In filing its claims for breach of contract, negligence, and breach of obligation as an agent, Phoenix has failed to meet its basic burden to establish that it is more likely than not that Enerco would have opted for full coverage. Phoenix's rights, as subrogate of Enerco's rights, are subject to the limitation of liability which the parties agreed to. The record does not suggest that Phoenix committed a wrong or somehow

defrauded Enerco, and thus equity would not prevail should those responsible for damaging the Transformer be given a free outright pass on liability.

Kavanagh argues that even this $25,000 cap is precluded based on federal common law regarding subrogation claims.  Specifically, Kavanagh raises that "where a shipper obtains insurance to protect its shipment, a loss occurs during shipment, and the shipper's insurer pays on the loss, that insurer *may not* bring a subrogation claim against a party that allegedly failed to make the shipper aware of the option of purchasing full coverage from the transporting carrier transporting the shipment." (Kavanagh MSJ Br. at 2.)  In turn, Phoenix attempts to distinguish the case law on which Kavanagh relies for this principle, however offers no case law to indicate otherwise.

The First and Ninth Circuits of Appeal instruct that the purchase of third-party insurance by a shipper counsels against invalidating the carrier's limitation on liability:

> [T]he fact that third-party insurance was available, and was purchased by the shipper, counsels against invalidating the limitation on liability.  "[A shipper] cannot contend that it was not given a 'fair opportunity' to opt for higher coverage [when the shipper] *did* opt for higher coverage when it insured [its package] through an independent entity." [internal citations omitted].  This is especially true when the plaintiff is not the shipper itself, but the subrogated third-party insurer of the package.  In such a case, "it is always in the best interest of a shipper's insurance company to argue that the shipper was denied a fair opportunity to opt for higher liability. . . . 'As best we can tell, [the insurer] is now bringing this lawsuit in an attempt to shift . . . the burden of loss it was paid to insure.'" *Travelers Indem., 26 F.3d at 900* (citing *Carman Tool & Abrasives, Inc. v. Evergreen Lines, 871 F.2d 897, 901 n. 10 (9th Cir. 1989)).*  "The [third-party] insurer merely stands in the shoes of the shipper, however, and cannot argue as if the shipper did not make the decision to insure separately."  *Read-Rite Corp. v. Burlington Air Express, Ltd., 186 F.3d 1190, 1199 n.4 (1999).*

Kemper Ins. Co. v. Federal Express Corp., 252 F.3d 509, 513-14 (1st Cir. 2001).

In Kemper, the First Circuit Court of Appeals examined a suit brought by an insurance company as subrogee to invalidate the limitation of liability provided for in the relevant air shipment documents.  The appeals court explained that "[w]hen a shipper (or, as here, a subrogee standing in place of a shipper) contests the validity of a contractual clause that limits an air carrier's liability, we apply federal common law." Id. at 512 (citation omitted).  The appeals court found that the fact the shipper sought third-party insurance is an indication that the shipper intended to limit its liability with the air carrier.  The First Circuit Court of Appeals further explained: "Lastly, we must point out that [the insurance company] is in no way harmed by this type of limitation clause; in fact, it is the very existence of such a limitation that allows [the insurance company] to market third-party package insurance." Kemper, 252 F.3d at 514.  See also Travelers Indem. Co. v. Houston et al., 26 F.3d 895, 900 (9th Cir. 1994) ("Why would [the shipper] increase its costs by insuring the same cargo twice?").

The District Court of New Jersey has recognized this principle where the procurement of insurance indicates a shipper's awareness of its limitation of liability with a sea carrier. See Ferrostaal, Inc. v. M/V Sea Phoenix et al., 2004 U.S. Dist. LEXIS 27483 (D.N.J. Dec. 14, 2004) (J. Brotman); aff'd on other grounds, 447 F.3d 212 (3d Cir. 2006).

Specifically, Judge Brotman noted:

> Plaintiff chose to insure the cargo, which indicates to the Court that Plaintiff was aware that its recovery would be limited and may not fully compensate any potential loss.  *See, e.g., Travelers Indem. Co. v. Vessel Sam Houston, 26 F.3d 895 at 900 (9th Cir. 1994)* ("a shipper who chooses to insure its cargo through an independent insurance company has made a conscious decision not to opt out of COGSA's liability limitation."); *Carman Tool & Abrasives, Inc. v. Evergreen Lines, 871 F.2d 897, 901, n. 10 (9th Cir. 1989)* ("Indeed, there is every reason to believe that the shipper [,] by acquiring insurance] made a knowing and deliberate choice in foregoing the additional cost that would have been incurred in raising the liability limit[.]").

24

Ferrostaal, 2004 U.S. Dist. LEXIS at *19-20.

Phoenix argues that because the Third Circuit Court of Appeals in Ferrostaal rejected the "fair opportunity doctrine," the subrogation analysis is inapplicable here.  However, as the Third Circuit Court of Appeals explained at length therein, the fair opportunity doctrine relates to a separate inquiry regarding the availability for a shipper to opt for increased coverage at a higher rate.  Specifically, the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. 1300-1315, set forth a scheme by which the shipper is bound by a limited liability unless the shipper has acknowledged a higher value or agreed to a higher limit originally proposed by the shipper.  The fair opportunity doctrine, which was ultimately rejected by Third Circuit Court of Appeals, relates to COGSA's inquiry over rates.  That inquiry is analogous to the scheme set forth by the Carmack Amendment regarding the carrier's offering of a reasonable opportunity for the choice between different levels of liability, as detailed in Part Two of the Discussion section above.  As the Third Circuit Court of Appeals explained, "the discussion of 'fair opportunity' is best read as explaining the rationale behind the Interstate Commerce Act's requirement of a writing." 447 F.3d at 223.  The appeals court further noted that the text of COGSA is unlike that of the Interstate Commerce Act insofar as the latter has an explicit notice provision while the former does not, and therefore the COGSA should not be read as though it contains an implied notice provision.  447 F.3d at 227.

Thus, the Third Circuit Court of Appeals held in Ferrostaal that the fair opportunity doctrine is inconsistent with the COGSA, and recognized that while the COGSA does not include an explicit or implied notice provision, the Interstate Commerce Act does.  Despite Phoenix's averments, that analysis is apart from the indication that a shipper sought third-party insurance coverage due to its awareness of its limitation of liability agreement with the carrier.

Indeed, Ferrostaal was not a subrogation case, and the Third Circuit Court of Appeals affirmed the District Court's result without commenting on Judge Brotman's endorsement of Carman Tool and its progeny.  Moreover, in dismissing the applicability of the fair opportunity doctrine with respect to COGSA, the Third Circuit Court of Appeals highlighted its prevention of a windfall for subrogated insurers:  "Insurance through third-party maritime insurers is usually cheaper and more convenient than insurance by the carrier and prudent shippers will insure their cargo regardless of the allocation of liability for negligent damage.  The fair opportunity doctrine, in seeking to vindicate the rights of shippers, confers a windfall on subrogated insurers." 447 F.3d at 228.

Based on the foregoing, the Court finds that Phoenix, as Enerco's subrogee, is limited to a $25,000 cap in seeking restitution for damage to the Transformer.  To suggest otherwise would be inequitable and allow those responsible for damage to be held unaccountable.  Kavanagh's argument that even this cap should be denied is not persuasive, and indeed the cases on which Kavanagh relies upheld the limitation of liability rather than invalidating it altogether.[6]  As explained above, there is insufficient evidence to establish that Enerco would have opted for full Carmack liability.  Enerco's corporate designee testified that it was "impossible" to know whether it would have been purchased and that "nobody" would know the answer to the

---

[6]     See e.g., Carman Tool, 871 F.3d 897 (9th Cir. 1989) (limitation of liability clause upheld in case brought by insurance company in the name of shipper which was already compensated by insurer); Travelers Indemnity Company v. Vessel Sam Houston, 26 F.3d 895, 898 (9th Cir. 1994) (limitation of liability provision upheld in insurer's subrogation action); Read-Rite Corp v. Burlington Air Express, Ltd., 186 F.3d 1190 (9th Cir. 1999) (limitation of liability provision upheld in action brought by shipper and insurance company for damage arising from carriage of goods by air); Kemper Ins. Companies v. Federal Exp. Corp., 252 F.3d 509 (1st Cir. 2001) (limitation of liability found valid in subrogation action for damage arising from air shipment); Ferrostaal, Inc. v. M/V Sea Phoenix, 2005 A.M.C. 581 (D.N.J. 2004) (limitation of liability upheld in action brought by insured shipper for damage arising from sea shipment), aff'd 447 F.3d 212 (3d Cir. 2006)).

question.  Moreover, Enerco had never opted to purchase full coverage, nor has any customer of

Kavanagh or Norfolk Southern ever opted for it.  Further, the basic business decision to opt for

double-coverage at a total cost of $515,000, which represents over 25% of the value of the items

itself, is not persuasive where Phoenix's all-risk policy covered this shipment for $15,000.  Last,

Enerco's procurement of third party insurance coverage further corroborates the record that

Enerco was aware of its limitation of liability with Norfolk Southern.  The Court declines the

invitation to provide Phoenix a windfall where the very existence of the limitation of liability

allows for Phoenix to market third party insurance coverage in the first place.

Kavanagh's motion for summary judgment is therefore granted in part.  Phoenix may

subrogate the claims against Kavanagh only to the extent of the limitation of liability.

### 4.  Preemption

In addition to violations pursuant to the Carmack Amendment, Phoenix brings various

state claims against both Norfolk Southern and Kavanagh.  Norfolk Southern moves the Court

for summary judgment on the contract and negligence claims against it and argues that these

state claims are preempted by Carmack.  In opposition to the motion, Phoenix urges the Court

that the issue is premature because it is beyond the scope of review authorized by the Court.

However, the docket reflects a text order dated April 27, 2012 which instructs that "[t]he parties'

request to file motions for summary judgment as to the application of the Carmack amendment is

GRANTED."  The issue presented is whether the state law claims are preempted by Carmack,

and therefore preemption is necessarily within the scope of review authorized.  The Court

considers it here for efficiency.

Courts recognize three ways that federal law may preempt or displace state law:  (1)

express preemption, which requires an express statutory command, (2) field preemption, which

requires that a federal law "so thoroughly occupy a legislative field as to make reasonable the interference that Congress left no room for the state to supplant it," and (3) conflict preemption, in which state law makes it impossible to comply with both state and federal law.  Orlick v. J.D. Carton & Son, Inc., 144 F. Supp. 2d 337, 344 (D.N.J. 2001) (citations omitted).

It is well settled that Carmack preempts all state law causes of action against rail-carriers. "It is generally accepted that the principal purpose of the [Carmack] Amendment was to achieve uniformity, and thus Congress enacted the amendment to 'take possession of the subject of interstate carriers liability . . . and supersede all state regulation with reference to liability for lost or damaged property.'" Unisor Steel Corp. v. Norfolk Southern Corp., 308 F. Supp. 2d 510, 517 (D.N.J. 2004) (quoting Orlick, 144 F. Supp. 2d at 345).  See also Rini v. United Van Lines, 104 f.3d 502, 504 (1st Cir. 1997); Gordon v. United Van Lines, Inc., 130 F. 3d 282, 287-88 (7th Cir. 1997) (Carmack exists to provide "a measure of predictability for interstate carriers in the exposure to damages they face.").

The Carmack Amendment was originally enacted to govern bills of lading in the rail transportation industry.  Accordingly, Section 11706 imposes strict liability upon rail carriers. See 49 USC 11706, supra at 12.  In its current form, the Carmack Amendment provides a uniform national system of liability for interstate transport by rail and motor carriers.  See id. and 49 USC 14706, respectively. Thus, the state law contract and negligence claims against Norfolk Southern are clearly preempted and must be dismissed.

The Court reserves for another day judgment as to preemption of the claims against Kavanagh.  The parties have not moved for consideration on this issue, and there appears to be a split in the courts regarding the extent to which Carmack preempts claims against brokers, at

least in their arrangements with motor carriers pursuant to Section 14706.[7,8]  See <u>Ameriswiss

Technology, LLC v. Midway Line of Illinois, Inc. et al.</u>, 888 F. Supp. 2d 197 (D.N.H. 2012)

---

[7]      Section 14704 correspondingly imposes rights and remedies upon persons injured by transportation by motor carrier and the procurement of that transportation, including brokers. <u>See</u> 49 USC 14704; 49 USC 13501 et seq.

       A broker is defined therein as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier by compensation." 49 USC 13102(2).

       Further, Carmack defines covered transportation services broadly.  The term "transportation" includes:

> (A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and
> (B) *services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit,* refrigeration, icing, ventilation, storage, handling, packing, unpacking, *and interchange of passengers and property.*

       49 USCS § 13102(23) (emphasis added).

[8]      Moreover, federal-state relations pursuant to the interstate transport of property by motor carriers, water carriers, brokers, and freight forwarders is expressly preempted by the Interstate Commerce Commission Termination Act ("ICCTA") (federal authority over intrastate transportation):

> a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 USC 14501(c)(1)

"The ICCTA preemption provision 'had been part of the Federal Aviation Administration Authority Act ('FAAAA') passed by Congress in 1994.'"  <u>Ameriswiss Technology, LLC v. Midway Line of Illinois, Inc., et al.</u>, 888 F. Supp. 2d 197, 204 n. 7 (D.N.H. 2012) (quoting <u>Mastercraft Interiors, Ltd. V. ABF Freight Sys., Inc.</u>, 284 F. Supp. 2d 284, 285 (D. Md. 2003) and citing 49 USC 11501(h)(1)).

(subrogated negligence claim against broker for damage arising from truck shipment is impliedly and expressly preempted by Carmack and the ICCTA respectively, however the contract claim against broker is not preempted); <u>Atlas Aerospace LLC v. Advanced Transportation Inc. et al.</u>, 2013 U.S. Dist. LEXIS 58378 (D.Kan. April 24, 2013) (breach of contract claim against the broker for damage arising from truck transport is outside of the scope of Carmack and escapes preemption); <u>but</u> <u>see</u> <u>Curb Technologies, LLC v. Somerset Logistics, LLC</u>, 2013 U.S. Dist. LEXIS 94554 (July 8, 2013) (denying removal jurisdiction for claims against the broker because Carmack does not preempt them).

Thus, Section 14704 of Carmack at least impliedly preempts the field with respect to broker liability in a negligence action involving motor carriers, and the ICCTA expressly preempts the query as to brokers with respect to motor carrier arrangements.  <u>See</u> supra note 7, 8. Meanwhile, the portion of Carmack dealing directly with rail carriers, 49 USC 11706, defines "rail carrier" fairly broadly to mean "a person *providing* common carrier railroad transportation for compensation," with certain exceptions which are not applicable here.  49 USCS 10102(5) (emphasis added).  Further, "person" is defined therein as "a trustee, receiver, assignee, or personal representative of a person." 49 USCS 10102(4).  Last, "transportation" is also defined broadly and includes:

(A) A locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, *property*, facility, instrumentality, or equipment of any kind *related to the movement of* passengers or *property*, or both, *by rail*, regardless of ownership or an agreement concerning use; *and*

(B) *Services related to that movement, including* receipt, delivery, elevation, *transfer in transit*, refrigeration, icing, ventilation, storage, handling, *and interchange* of passengers and property.

49 USCS 10102 (emphasis added).

In sum, the Carmack Amendment covers every detail of claims against rail-carriers and therefore the state law claims against Norfolk Southern are preempted.  However, the Court leaves for another day the degree to which negligence and contract law claims against brokers are preempted with respect to rail-carrier logistics.

### III.     CONCLUSION

For the foregoing reasons, Phoenix's partial motion for summary judgment is denied. Norfolk Southern's partial motion for summary judgment on limited liability and preemption of the state law breach of contract and negligence claims is granted in full.  Kavanagh's motion for summary judgment on all claims against it is granted in part, to the extent that the subrogation action may proceed up to the limitation of liability.  There remain the Carmack Amendment claim against Norfolk Southern subject to limited liability, and the state law claims against Kavanagh for breach of contract, negligence, and breach of its obligation as an agent, also subject to the limitation of liability.


**/s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.


**Date**:  May 16, 2014